CARAWAY, J.,
dissenting.
hi respectfully dissent. The majority’s statutory construction of former Article 149.1 of the Mineral Code jumbles the Civil Code principles for statutory interpretation, La. C.C. arts. 9, et seq. Ambiguity exists when the statute’s language is fairly susceptible of different meanings. La. C.C. art. 10. Two different meanings for Part A(l) are never actually explained from the statute’s language by the majority. The opinion identified only one “reading” that is “suggested” in Part A(l). Nevertheless, the ruling implies that the two possibilities for a conveyance to a conservation organization contemplated by Part A(l) are the following:
(1) The landowner conveys the land intending imprescriptibility for “a mineral right” “reserved” unto himself, the vendor;
and/or
(2) The landowner conveys the land intending imprescriptibility for any existing mineral rights burdening his land and owned by others.
On its face, with no attempt to place construction # 2 within the language of the statute, such intent by a benevolent landowner borders on the “absurd consequences” measure for statutory construction. La. C.C. art. 9. The broad objective of Article 149.1 is to direct a landowner’s conveyance of land to a conservation organization and allow him imprescriptible mineral rights. As the landowner contemplates a voluntary sale to a conservation organization, he has no self-interest or obligation to make imprescriptible the mineral rights of others who contracted for their rights under the prescriptive regime of nonuse. They received their bargained-for mineral rights without any expectancy that some future landowner, with whom they may never have been in privity, might | ^benevolently place their servitude under a new, more favorable prescriptive regime.
According to the trial court, had Yates made no expression of reservation about mineral rights in the Conservancy deed, Marston’s and Young’s mineral servitudes would have continued subject to the pre *682 scription of nonuse and prescribed. The majority appears to agree. Thus, if Yates had made the sale of the land to the Conservancy subject to the existing mineral servitudes, adding “which shall continue under the prescriptive regime of nonuse,” could Marston and Young complain? Yet, Yates actually did intend that Marston’s and Young’s mineral servitudes continue under the prescription of nonuse. The Conservancy deed shows that if those pri- or mineral rights prescribed, Yates expressly purports to reserve the “reversion-ary rights” related to those servitudes.
In my opinion, Article 149.1(A)(1) was never intended to protect the rights of prior mineral servitude owners who long since had acquired their mineral rights subject to the prescription of nonuse. The statute would certainly be unusual, if not absurd, to turn on the whim of the landowner as he sells the land to a conservation organization and contemplates the measure of his benevolence to the owners of existing mineral rights.
Most importantly, construction #2 as recognized by the majority cannot be found within the clear and unambiguous language of Article 149.1(A)(1). The majority confusingly examines the wrong language of Part AQL). The meaning of the concept of reservation (“reserved”) is the substantive focal point for statutory construction in this case. “A mineral right ... reserved” (a mineral reservation) is the landowner/vendor’s intended |sact of creation of a new mineral right. The legislature’s focus on a mineral right “reserved” (or created) in a conservation deed is the statutory predicate for this impre-scriptible right allowance in Part A(l) and is clearly understood from the established jurisprudential meaning for a mineral reservation. The Louisiana Supreme Court makes it clear:
There is a difference between the sale of a tract of land with a reservation of the minerals and the sale of land subject to existing mineral rights in it. The former is accomplished with language of reservation and indicates that something new is being created. A vendee under such mineral reservation is led to believe that the servitude created by it will prescribe at the end of ten years unless there is mineral development within that time on the land sold. On the other hand, the latter form of conveyance, accomplished with language of exception, puts the vendee on notice that there is a pre-existing mineral servitude on the land which may extend beyond the limits of the land purchased, and that prescription on any such servitude may have been interrupted, or may in the future be interrupted, by mineral development on land other than his own. Hence, language of reservation will suffice to declare one type of charge against the land, but language of exception is necessary to declare the other.
Hodges v. Long-Bell Petroleum Co., 240 La. 198, 121 So.2d 831, 839 (1960) (Emphasis added). With this accepted understanding in Louisiana law of a landowner/vendor’s mineral reservation for the creation of “something new,” a new mineral right, the language employed by the legislature in 1983 with the addition of Article 149.1 into the Mineral Code is not ambiguous. It is only the vendor’s reserved mineral right that is created under the imprescriptibility regime. That alone is the subject matter of Part A(l).
Additionally, the legislative history for the Mineral Code and pre-code legislation is instructive. The legislature had previously demonstrated pre-code that it could write an imprescriptibility statute protecting 1 outstanding minerals. It did that with former La. R.S. 9:5806 for convey- *683 anees to the United States prior to the Mineral Code. The statute reflects a clear understanding of the Hodges distinction between new mineral rights created by-reservation and prior mineral rights to which the sale of land is made subject. The former statute provided:
When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies from any person, firm or corporation, and by the act of acquisition, order or judgment, oil, gas or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas or other minerals or royalties, still in force and effect, the rights so reserved or previously sold shall be imprescriptible.
Former La. R.S. 9:5806.
Pre-code, this statute allowing protection for existing mineral rights in sales to the United States was contrary to the rules governing imprescriptibility for sales of land to the state or state agency. See Official Comment, Article 150 of Mineral Code, La. R.S. 81:150. The laws for state acquisition of lands allowed the seller of the land to reserve the expectancy of the extinction of any outstanding mineral right and receive a new imprescriptible mineral right upon such extinction. With adoption of the uniform rule of Article 150, this disparity was eliminated by the redactors of the Mineral Code who rejected any need to provide protection to the owners of outstanding mineral rights. La. R.S. 31:150. Instead, the chosen policy to promote the sale of property to governmental entities was to provide the incentive to the landowner to make the sale to the government with the assurance that even the existing mineral rights outstanding against his property may revert and fall into his ownership as imprescriptible mineral | .^ownership. That policy has never been changed since 1974. It was simply overlooked in the later addition of Article 149.1 in 1983, when the prevailing principle of Article 150 was not expanded to include a sale to a conservation organization. Nevertheless, Yates can make the argument against the United States that the rule of Article 150 applied after the acquisition of the land by the United States in 2003 and before Marston’s and Young’s rights prescribed since the United States’ acquisition was made subject to the Yates’ reservation of the reversionary rights. Likewise, the amendment to the law in 2004 with the enactment of new Article 149 of the Mineral Code arguably protects the Yates’ prior reservation of the reversionary rights. Anadarko Production Co. v. Caddo Parish School Bd., 455 So.2d 699 (La.App. 2d Cir.1984), writ denied, 460 So.2d 610 (La.1984).
The passage of the Mineral Code also addressed and clarified the effect of a later transfer of the land by the governmental entity upon imprescriptibility. La. R.S. 31:151 and former Mineral Code Article 149. In short, such transfer from governmental ownership to private ownership would start the prescription of nonuse against the formerly imprescriptible mineral right. Nevertheless, the possible transfer from a private conservation organization to the state or federal government did not fit that mold, and such conservation entities were likely to make transfers to public ownership. Hence, Part A(2) of Article 149.1 was necessary to address this different transfer situation and its effect on the imprescriptible mineral right previously reserved. It does so in the context of the entire statute where Part A(l) has already made imprescrip-tible only that mineral right “reserved” or | (¡created in the deed to the conservation organization. Such imprescriptible miner *684 al right allowed by operation of Part A(l) remains imprescriptible after the transfer to the state or federal government and “the prescription of non-use shall not apply.” The text of both sections of the statute has the single focus upon the mineral right “reserved” and created in the initial sale of the land to a conservation organization.
As a final matter, the present owner of the land, the United States, cannot be made a party in this state court proceeding. Nevertheless, under Code of Civil Procedure Article 642, this court has determined that the action may proceed as a real action between the present parties who claim ownership of competing mineral rights of the same land. La. C.C.P. art. 642; La. C.C.P. arts. 3664, et seq. Yates and their mineral lessee have not only demonstrated mineral titles but have established possession of the mineral estate through the unit operations of Petrohawk affecting the property. Thus, as between the parties to this action, Yates and Petro-hawk as possessors are “considered provisionally as the owners of the thing ... until the true owner is established.” La. C.C. art. 3423. The United States may be the true owner. Nevertheless, Marston’s and Young’s own claims to imprescriptible mineral servitudes find no legal support in any weakness in Yates’ mineral title which may be asserted by the present landowner. Clearly, the present landowner’s argument against Marston’s and Young’s mineral servitudes is the same as presented in this dissent without regard to any weakness in Yates’ different claim for imprescriptibility. Article 150 of the Mineral Code was not amended and expanded in 1983 to allow a seller to a conservation organization to reserve the expectancy of the extinction of 17outstanding mineral rights. Nevertheless, it is a leap in logic to conclude that because Article 150 was not amended, Article 149.1 must have somehow made the Marston and Young mineral servitudes im-prescriptible. That hollow conclusion is unsupported by the clear* and unambiguous language of Article 149.1.